Mr. Justice Huger
delivered the opinion of the court.
The motion to quash the indictment must be dismissed for the reasons assigned by the circuit court.
Before I proceed to consider the first and important-ground, on which the motion for a new trial is submitted, I will briefly observe on the second, that in the case of Martin vs. Maverick, (ante 24,) recently decided by this court, it was ruled that the right of polling the jury did not attach to either party, plaintiff or defendant; that if. was a mean to which the court sometimes resorted, to ascertain if the jury were agreed on their verdict; but that *527 when fully satisfied of this fact, by other and more accustomed means, it would not be resorted to.
The first ground presents a question which formerly excited much interest in England, but one which I had thought long since settled in this state. I find however on investigation, that no decision directly on the point, has been made bv this court, however uniform may have been the decisions on the circuit. I shall therefore proceed to en-quire,
1st. Whether according to the common law of England, the juries are confined to the fact of publication, and the truth of.the tnuendoes ? And if such be the case, whether that rule is of force in this state ?
That a difference of opinion existed in England as ts the rights of jurors on this subject, is very apparent from the parliamentary and judicial history of that country.' In the senate and at the bar, as well as in the public prints, a most decided opposition was kept up for years; and it was only terminated by the statute of the 32 of George III, which restored to jurors, the right of deciding upon the intention as well as the feet of publication, and the truth of the inuendoes. As this statute, however, was not passed until long subsequent to the separation of the United States from Great Britain, its provisions are not binding here ; but the law as it stood anterior to that statute, must be our rule ; .unless controled by other causes.
That the rule as laid down by the circuit court was the law of England, prior to the time of the statute, is, I ’think, abundantly evident. As early as the year 1731, Lord Raymond, in the case of the King vs. Franklin, distinctly recognized it as settled doctrine. His words Were, there are three things to he considered, whereof two by you, the jury, and one by the court.
The first is, whether the defendant is guilty of the publication or not ?
The second, whether the expressions refer to his present majesty or his principal officers, and are applicable to them or not? v
*528 The third docs not belong to the office of the jury, but to the office of the court. '' ,
The intention was by hint regarded, as an inference of law.
The same doctrine was recognized by Lord Chief Justice Lee, in 1752, in the'case of the King vs. Owen, (10 St. Tr. App. 194.)
In the celebrated case of the King vs. Wilkes, in 1764, for publishing the 45th No. of the North Britain, the verdict of printing and publishing, wap regarded as a general verdict of guilty, (4 Burr, 2527.)
Lord Mansfield, in the case of Woodfall, for publishing fvnius, (5 Burr, 2661,) stated that '■'•guilty of printing and publishing, where there is no other charge, is guilty; for nothing more is to be found by the jury.” in this case, he observed that this direction, though often given, with an express request from him, if any doubt existed as to its correctness, that the court might be moved upon it, was never complained of.
In the case of the Dean of St. Asaph, tried in 1784, Mr. justice Butter laid down the same doctrine, which, on an appeal to the bench of judges, was, fully and unanimously confirmed.
In the case of the King vs. Sockdale, as well as in that of the King vs. Withers, Lord Kenyon supported the-same doctrine, (3 Tem. R. 428.)
■ If to authorities so higli, any- additional support be necessary, it is to be found in the reply of the twelve judges of England, to the questions put to them by the House of Lords in 1783; when they had under consideration the Libe! Bill. The question was, “ whether on the trial of an information, or indictment for a libel, is the criminality or innocence of the person, set forth in such information or indictment, as the libel, matter of fact, or matter of law, where no evidence is given for the defendant ?” The answer was, “ matter of law.”
In opposition to decisions so uniform, and commanding 'the opinions of jurists at the bar and in the senate, *529 however respectable," cannot be regarded as authoritative,; They may indeed shew What the law ought to be but to' the courts alone we can resoit, to ascertain -what the law is. That this rule is at variance with the the general principles oflaw, is not denied. In every other case, without exception, where the general issue be joined, a general verdict resolves both law and fact. And although it be true as a general maxim, that “ ad. questionem legis respondent judices; et ad questionem facti respondent jurato-resP yet where law and fact are blendid, as they must be in the general issue, it is impossible to decide the one without the other, and therefore.in all such cases, the juries, if they decide at all, must Ox necessitate' decide the law as well as the fact. Libels, however, are said to differ so Touch from all other criminal offences, as to justify a departure from the general rule of proceeding. Intention, which is the very essence of crime, is said in all other cases to ■ be infered alone from facts, which are within the province of the jury; but that in the case of libel, the intention is an inference of law from a written instrument, the construction of which is always within the province of the court.
But there is a manifest distinction between the purport or meaning of an instrument in writing; find the intention, or quo animo, with which that instrument was written. The most harmless words in their accustomed sense, may, under pécüliar cireumstances indicate the most malicious disposition, an'd be productive of infinite mischief; whereas words of a very different character may be uttered without malice, and from circumstances be perfectly harmless : and whether they be the one or the othér, is a fact which can only be infered from other facts, as- time and place, See. To have written at one period of a man in. France, that he was a royalist, would have been malicious and injurious; whereas the same epithet would now be regarded as harmless, if not complimentary. In civil cases, the intention or purport of the instrument; is-the only subject of enquirv. In criminal cases, the quo anhno^Av-. *530 disposition of mind with which the instrument was written, is the question. The first is an inference of Jaw,■ and pro-' perly belongs to the court ; the last is an inference of fact, and ought to belong to the jury. This distinction is preserved in all cases of forgery. The jury are then not limited in their enquiry to the simple fact of execution, but determine the quo animo with which it was done. It was not, I apprehend, because jurors are less qualified to, infer from circumstances, the intention with which a libel had been published, than that with which a note had been executed, or that intention was not as essential to the constitution of a libel as a forgery, that the law of England has reserved the first to the judges and given the other to the jurors. In the peculiar form of the British government, I think is to be found the reason of the exception. Composed of three distinct orders, King, Lords, and Commons, much regulation was required to preserve each in its respective sphere. The history qf England is scarcely more .than the history of an almost perpetual contest for power, between these different orders. Each iri turn has gained the ascendency ; but neither has been able to destroy the other. The patronage of the king, the wealth of the nobility, and the physical power of the commons, acting in .different combinations, and under different circumstances, have hitherto preserved that balance of power, on which the preservation of the government is supposed to . depend. In these different contests, each order resorted to all the means it possessed for aggression or defence. Perhaps the most formidable power which can be arrayed against prerogative, is the press. If unrestrained, its success would seem to be almost inevitable. So formidable was this power regarded by all parties, and so vitally con-, nested was it supposed, with the doctrine of libel, that we find the friends of prerogative, among whom have always stood pre-eminently distinguished, the judges of England, invariably contending for the rights of the court, and the friends of the commons, as invariably contending for the rights of juries. If to this peculiarity of the British *531 government, the rule in question is properly traced, it would only be consistant with a very common maxim of the common law itself, cessante ratione cessat et ipsa lex, to declare it not of force in this state, where we have but one order, and that order the people. But on this point, the act of the legislature, which makes of force the com» mon law in this state, is explicit. It is *offorce, only so fát as is consistent -with our constitution, ■customs and laws'.
Nott, for the motion.
Clarke, solicitor, contra.
In the case of the State vs. Lehre, this point did not necessarily arise, but the court incidentally noticed it and observed, that they were unanimously of opinion that the intention with which the publication was made, as well as the fact of publication and truth of the inuendoes, wa§ involved in the general issue ; and that the whole case, law as well as fact, was resolved by a general verdict; and such is now the opinion of this court.
The motion therefore for a new trial, must be granted.
Justices C.olcock, Richardson, and Gantt, concurred.